UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. |
| ) | |
| CHERYL L. JONES, ) | JURY TRIAL DEMANDED |
| ) | |
| Defendant. ) | |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("the Commission") alleges the following against defendant Cheryl L. Jones ("Cheryl Jones") and hereby demands a jury trial:

## PRELIMINARY STATEMENT

1.  This enforcement action involves a fraudulent offering of unregistered securities and a Ponzi scheme called the "Bridge Fund" that raised approximately $14.5 million from more than 25 investors between 2007 and 2015. Defendant Cheryl Jones recruited many of her friends and associates to be investors. The mastermind of the scheme was her brother Mark A. Jones ("Mark Jones"), who told investors that their money would be pooled to provide short-term "bridge loans" to Jamaican companies that had supposedly been approved for commercial bank loans but needed interim financing until their bank loan funding came through, and that their investments would pay interest of approximately 15% to 24% annually. The Bridge Fund was a scam. Mark Jones deposited the investors' money in his personal bank account and diverted almost all of it for personal expenses and to make payments to other investors – the hallmark of a

Ponzi scheme.[1]  Mark Jones agreed to pay Cheryl Jones commissions of approximately 10% of the principal invested by new investors she referred to him.  He also paid her a monthly "legal retainer" for services that she supposedly rendered to him or the Bridge Fund.  Between 2007 and 2015, Cheryl Jones was wrongfully enriched by the 100% repayment of her $875,606 investment in the Bridge Fund (whereas the other investors have lost some, if not most, of their investment), as well as additional payments totaling $514,912 that she received from her brother.

2. Through the activities alleged in this Complaint, Cheryl Jones engaged in the offer or sale of unregistered securities, in violation of Section 5 of the Securities Act of 1933 ("Securities Act").

3. The Commission seeks: (a) a permanent injunction prohibiting Cheryl Jones from further violations of Section 5 of the Securities Act; (b) disgorgement of her ill-gotten gains, plus prejudgment interest; and (c) a civil penalty due to the egregious nature of her violations.

## JURISDICTION

4. The Commission seeks a permanent injunction and disgorgement pursuant to Section 20(b) of the Securities Act [15 U.S.C. §77t(b)].  It seeks the imposition of a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)].

5. This Court has jurisdiction over this action pursuant to Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§77t(d), 77v(a)].  Venue is proper in this District because a parallel criminal proceeding against Mark Jones is pending in this District, the conditions of his release restrict him to Massachusetts, and at least three of the victims currently live in Massachusetts.

---

[1] As set forth in ¶8 below, Mark Jones is the subject of a separate enforcement action filed by the Commission, as well as a parallel criminal proceeding based on the same misconduct.

6.    In connection with the conduct described in this Complaint, Cheryl Jones directly or indirectly made use of the mails or the means or instruments of transportation or communication in interstate commerce.

**DEFENDANT**

7.    **Cheryl L. Jones**, age 62, is a resident of Washington D.C., where she works as a real estate agent. She is licensed to practice law in the District of Columbia but does not maintain an active practice.

**RELATED PARTY**

8.    **Mark A. Jones**, age 64, is the brother of Cheryl Jones. He is a former resident of Boston, Massachusetts. In March 2016, the Commission filed an emergency enforcement action against him in the U.S. District Court for the District of Massachusetts concerning the Bridge Fund scheme. On March 28, 2017, a default judgment was entered against him in that case. The default judgment permanently enjoined him from further violations of the federal securities laws, ordered him to pay $3,822,973.48 of disgorgement, and ordered him to pay a civil penalty of $160,000. (D.Mass. Case No. 1:16-cv-10524-RGS, Dkt. #29.) Mark Jones is also the subject of criminal charges stemming from the same misconduct. On September 16, 2016, he pled guilty to wire fraud and engaging in monetary transactions in property derived from specified unlawful activity. (D.Mass. Case No. 1:16-cr-10220-MLW, Dkt. #30.) On May 24, 2017, Jones was sentenced to serve seventy months in prison. The amount of court-ordered restitution will be determined at a future hearing.

## **FACTUAL ALLEGATIONS COMMON TO ALL COUNTS**

**The Bridge Fund Scam**

9. In or around 2007, Mark Jones began to solicit investors for an enterprise he called the "Bridge Fund." (It appears that the "Bridge Fund" is a name that Jones used in his sales pitch to potential investors, not a legal entity.) He told investors that he had a contact at a Jamaican bank who provided him with information about companies that had been approved for commercial bank loans but were still waiting for the funding to come through. He told investors that the "loans are done with full legal documentation and collateralized – typically 2-3x the value of the loan" and that all potential loans "go through a credit committee" consisting of himself, an attorney, and a bank credit officer. He told investors that the bridge loans would generate interest of approximately 15% and 24% annually.

10. To increase the investors' confidence in the legitimacy of his business, Mark Jones met with at least two investors in Jamaica. During the trips, he pointed out various local projects that the investors' money had purportedly funded. In 2011, he showed one investor an apartment complex for moderate-income families and a quarry project for limestone.

11. Mark Jones instructed the investors to send their money directly to him, and he deposited the money in his personal bank account. He explained to investors that routing their funds through his account would reduce paper work and shield them from undue economic risks. In return, he provided investors with his promissory notes and personal guarantees.

12. Mark Jones provided investors with periodic account statements purporting to detail the principal and quarterly interest owed on each promissory note. While some investors received periodic interest payments, others rolled over the purported accrued interest in their accounts.

13. Mark Jones obtained funds from at least 25 investors (including his mother, his sister Cheryl Jones, and one other relative). The investors sent him a total of approximately $14.5 million. Many of the investors are retirees who are not sophisticated investors and who are now in financial straits after investing their savings with Jones.

14. There were virtually no bridge loans. Mark Jones deposited the investors' money in his personal bank account and used almost all of it for personal expenses and to make payments to other investors – the hallmark of a Ponzi scheme.

**Cheryl Jones's Solicitation of Investors**

15. In 2007, Cheryl Jones became one of the first investors in the Bridge Fund. Soon after investing with her brother and receiving promissory notes in return, she began introducing her friends and work associates to him. In the course of her efforts to recruit investors in the Bridge Fund, Cheryl Jones solicited specific investors that she thought had money to invest and even traveled to Jamaica with a potential investor to meet with her brother.

16. As one example of Cheryl Jones's solicitation efforts, on September 18, 2010, in response to her brother's report that an investor had committed $300,000 to the investment scheme, she stated: "Great! I am sure that's just the tip of the iceb[e]rg. I think she is sitting on $8 million." The investor was a friend and co-worker of Cheryl Jones who eventually invested $800,000.

17. As another example of her solicitation efforts, in or about 2010, Cheryl Jones travelled to Jamaica with an investor. During the trip they visited Jones, who took them to see a real estate development that he described as a potential recipient of bridge loans provided, in part, by funds from that investor.

18.     Cheryl Jones sometimes served as a conduit for conveying information to investors.  For example, in an email dated March 16, 2014 between Mark Jones, Cheryl Jones, and an investor about the logistics of investing in the Bridge Fund, Mark Jones provided the investor with some information and then stated: "I gave Cher[yl] the web-site reference, and I think you and she are going to be together this evening, in which case I am sure she will share it with you."

19.     Cheryl Jones's involvement in the investment scheme continued after investors transferred money to Mark Jones.  In early 2011, when other investors became concerned about the lack of transparency in the assets held by the Bridge Fund, she urged her brother to provide a contingency plan because she is "afraid that [he] will lose more investors as they consider the implications."  On February 4, 2013, when Mark Jones failed to send periodic account statements to his investors, she emailed him suggesting that he "reinstitute that practice to keep people calm."

**Cheryl Jones's Receipt of Investor Funds**

20.     In return for her promotion of the Bridge Fund, Cheryl Jones was promised a higher interest rate on her promissory notes (24%) than any other investor (including Mark and Cheryl Jones's mother).  Cheryl Jones well understood that the 24% interest rate she received was higher than the rate received by other investors.

21.     Cheryl Jones entered into agreements with Mark Jones that entitled her to commissions of approximately 10% of the principal invested by new investors she referred to him, as well as any downstream investors referred by her referrals.  No other investors in the Bridge Fund received any commissions, even those who also introduced investors to Mark Jones.  For example, when one investor introduced Mark Jones to her friends who later invested in the

Bridge Fund, it was Cheryl Jones who received the commissions. At no point during the many conversations she had with her friends and later co-investors about the Bridge Fund did Cheryl Jones reveal that she was being paid a hefty commission for every investment she helped to secure for her brother.

22. Cheryl Jones received a "legal retainer" from Mark Jones that was at one point as high as around $7000 a month. These payments bore no relation to the fair value of any legal services she may have actually provided to the Bridge Fund. Although she is an attorney admitted in Washington D.C., Cheryl Jones did not maintain an active legal practice. (At all relevant times, she was employed as a real estate agent, but she provided no real estate services to her brother.) Cheryl Jones well understood that the payments she received from Mark Jones far exceeded the value of any legal services that she may have provided to the Bridge Fund and were, in fact, a disguised form of compensation for her role in soliciting investors and investing her own money in the Bridge Fund.

23. Cheryl Jones was wrongfully enriched by reason of the diversion of investor funds to her benefit, including: (a) her preferentially inflated 24% interest rate; (b) the 10% commissions for her solicitation of investments in unregistered securities; and (c) the bogus legal retainer payments.

24. Cheryl Jones was also wrongfully enriched by virtue of having received preferential treatment in the allocation of losses when the Bridge Fund collapsed. Whereas the other investors lost some, if not most, of their original investment (including some who lost a major portion of their life savings), Cheryl Jones recovered her entire investment in the Bridge Fund.

25. Between August 2007 and April 2015, Mark Jones paid Cheryl Jones approximately $1,390,518, using funds drawn from accounts in which investor funds constituted a substantial portion of the balance. Overall, Cheryl Jones was wrongfully enriched by reason of her recovery of her entire investment in the Bridge Fund, which amounted to $875,606, as well as additional payments totaling $514,912. Out of the $1,390,518 that Cheryl received from her brother Mark in connection with the Bridge Fund scam, she received a total of $619,664 after July 1, 2012.

## CLAIM FOR RELIEF
### (Violation of Section 5(a) and 5(c) of the Securities Act)

26. The Commission repeats and incorporates by reference the allegations in paragraphs 1-25 of the Complaint as if set forth fully herein.

27. Investments in the Bridge Fund were never registered with the Commission, and Cheryl Jones did not register or attempt to register any offering of securities under the Securities Act or any class of securities under the Securities Exchange Act of 1934.

28. Cheryl Jones, directly or indirectly: (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect and for which no exemption from registration has been available; and/or (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been filed and for which no exemption from registration has been available.

29. As a result, Cheryl Jones violated Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§77e(a), (c)].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission requests that this Court:

A.     Enter a permanent injunction restraining Cheryl Jones, as well as her agents, servants, employees, attorneys, and other persons in active concert or participation with her, from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect, in violation of Section 5 of the Securities Act [15 U.S.C. §77e];

B.     Require Cheryl Jones to disgorge her ill-gotten gains, plus prejudgment interest, with said monies to be distributed in accordance with a plan of distribution to be ordered by the Court;

C.     Order Cheryl Jones to pay an appropriate civil penalty pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)];

D.     Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

E.     Award such other and further relief as the Court deems just and proper.

Respectfully submitted,

 /s/  Frank C. Huntington
Frank C. Huntington  (Mass. Bar No. 544045)
    Senior Trial Counsel
J. Lauchlan Wash  (Mass. Bar No. 629092)
    Senior Enforcement Counsel
Xinyue A. Lin  (Mass. Bar No. 672786)
    Enforcement Counsel
Martin F. Healey  (Mass Bar No. 227550)
    Regional Trial Counsel

Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
Boston Regional Office
33 Arch Street
Boston, MA  02110
(617) 573-8960  (Huntington direct)

(617) 573-4590  (fax)
huntingtonf@sec.gov  (Huntington email)

Dated:  July 3, 2017